IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LILIA ARIAS and MALGORZATA SOROKOSZ, )
                                     )
                   Plaintiffs,       )
                                     )   No. 05 C 5940
         v.                          )
                                     )   Judge Robert W. Gettleman
Chicago Police Officer MICHAEL ALLEGRETTI )
and the CITY OF CHICAGO,             )
                                     )
                   Defendants.       )

## MEMORANDUM OPINION AND ORDER

In a first amended complaint plaintiffs Lilia Arias and Malgorzata Sorokosz have sued Chicago Police Officer Michael Allegretti and the City of Chicago alleging unreasonable seizures in violation of the Fourth Amendment to the United States Constitution (Count I). In Counts II through IV plaintiffs allege state law claims of assault against Allegretti and respondeat superior and indemnification against the City. The City has moved for summary judgment on the three counts directed toward it (I, III and IV). For the reasons set forth below, that motion is denied.

## FACTS

The sordid facts of this case are largely undisputed, at least between plaintiffs and the City. Defendant Allegretti, a 17th District patrol officer stopped each plaintiff (on separate occasions) for committing routine traffic violations. Each plaintiff admits that she was guilty of the violation for which she was stopped. Each plaintiff alleges that once stopped, defendant Allegretti requested each to expose herself in exchange for not receiving a ticket. Allegretti denies these allegations, but for purposes of this motion, the City has admitted the facts as pled.

Arias was pulled over on November 30, 2004, at 7:00 a.m. for running a red light. Allegretti asked for her license and proof of insurance. Arias gave Allegretti only an expired insurance card. She had no license with her. Allegretti said "flash me." Arias refused. Allegretti then had Arias follow him to a spot where she could park her car. He had her get into the back of the squad car and took her to the police station. On the way to the station he asked Arias various personal questions such as her name, where she was coming from, whether she had a boyfriend, whether she would cheat on her boyfriend and whether she had someone on the side. Arias asked Allegretti to give her a break, to which he replied that he would have had she flashed him. At the station Allegretti wrote tickets for failure to have a license and running a red light, but not for lack of insurance. After writing the tickets, Allegretti told Arias that he might not show up to court and that if he did not, the charges against her might be dropped.. He then told her that if he did that she should go to the same location the following day to meet him, and that she should not wear underwear so she could "do a little dance for him." Arias refused. Allegretti then told her to "flash him." She refused. Allegretti then told her to open her jacket. Because she was wearing a sweater, Arias complied. Arias was then given the citations and released.

After being released, Arias went home and called the Chicago Police Department Office of Professional Standards to complain. The Internal Affairs Division assigned an investigator who found Arias credible, but nothing else was done. Allegretti was never notified of the charges, and no further investigation was conducted.

On May 24, 2005, Allegretti stopped plaintiff Sorokosz for making an illegal right turn on a red light. Following his pattern, Allegretti asked Sorokosz personal questions, including

questions about her boyfriend. Sorokosz gave Allegretti her insurance card, but had no license because she was driving on a ticket. She did not have a copy of the ticket with her. Allegretti told her that her license could be suspended if he gave her another citation. He then asked what she would do to avoid a ticket and told her to show him her breasts. Afraid that she would lose her license which she needed for her employment, she complied with Allegretti's demands. Allegretti then told her to unzip her pants and touch herself. She again complied, unzipping her pants and touching her breasts. Allegretti then told Sorokosz to follow him. She started to do so, but then realized that Allegretti was not leading her to a police station, but down an alley. She stopped her car and called 911. As a result of that call, Allegretti was suspended. In August 2005, he was criminally charged with official misconduct.

## **DISCUSSION**

In Count I, plaintiffs allege that they were subjected to unreasonable searches in violation of the Fourth Amendment. The City has moved for summary judgment on Count I as it pertains to it, arguing that the undisputed facts demonstrate that Allegretti's alleged actions, even if true, were not the result of inadequate training, discipline or supervision of police officers, and therefore plaintiffs cannot satisfy their burden under Monell v. New York City Department of Social Services, 436 U.S. 658, 694 (1978).

Because municipal liability under § 1983 cannot be founded on the doctrine of respondeat superior, Board of County Commissions of Bryan County Oklahoma v. Brown, 520 U.S. 397 (1997), plaintiffs must establish that they suffered a constitutional deprivation and that the deprivation occurred as a result of a municipal policy. Pembaur v. City of Cincinnati, 475 U.S. 469, 479-80 (1986). Municipalities are liable under § 1983 "when execution of a

3

government's policy or custom, whether made by its lawmakers or by those who's edicts or acts may fairly be said to represent official policy, inflicts the injury. Monell, 436 U.S. at 694. A municipal policy can be shown in three ways: "(1) an express policy that, when enforced, cause[d] a constitutional deprivation; (2) a wide-spread practice that, although not authorized by written law or express municipal policy, [was] so permanent well-settled as to constitute a custom or usage with the force of law; or (3) the act of a person with final policy-making authority." McTigue v. City of Chicago, 60 F.3d 381, 382 (7th Cir. 1995).

When liability is predicated on a wide-spread practice lacking formal approval, a plaintiff must demonstrate that the policy-making authority both knew of and acquiesced in a pattern of unconstitutional conduct. McNabola v. Chicago Transit Authority, 10 F.3d 501, 511 (7th Cir. 1993). To establish Monell liability based on evidence of inadequate training or supervision, as plaintiffs attempt in the instant case, they must present proof of "deliberate indifference" on the part of the City. Sornberger v. City of Knoxville, Illinois, 434 F.3d 1006, 1029-30 (7th Cir. 2006). Such proof can be evidence of either (1) failure to provide adequate training in light of foreseeable consequences, or (2) failure to act in response to repeated complaints of constitutional violations by its officers. Id.

In the instant case, the City raises two challenges to plaintiffs' Monell claim. First, the City argues that neither plaintiff has suffered a constitutional violation. According to the City, not every official abuse of power, even if unreasonable, unjustified or outrageous rises to the level of a federal constitutional deprivation. McCoy v. Harrison, 341 F.3d 600, 605 (7th Cir. 2000). "Some such conduct may simply violate state tort law or indeed may be perfectly legal though unseemly and reprehensible." Kernats v. O'Sullivan, 35 F.3d 1171, 1175 (7th Cir. 1994).

4

The City appears to be arguing that neither plaintiff was "seized" for purposes of the Fourth Amendment. Citing California v. Hodari D., 499 U.S. 621, 624-26 (1991), the City argues that a seizure without submission is not a seizure governed by the Fourth Amendment. Then, citing McCoy, it argues that the Fourth Amendment is not triggered unless (1) physical force was used along with a showing of authority, and (2) the person submitted to that showing of authority. McCoy, 341 F.3d at 605.

The City reads McCoy incorrectly. A seizure does not depend on the use or threatened use of physical force. All that is required is "an intentional acquisition of physical control," Brower v. County of Inyo, 489 U.S. 593, 596 (1989), with the state actor "restraining the freedom of a person to walk away, thereby seizing that person." McCoy, 341 F.3d at 605 (quoting Tennessee v. Garner, 471 U.S. 1, 7 (1985)). It is beyond dispute that the "temporary detention of individuals during the stop of an automobile by police, even if only for a brief period and limited purpose, constitutes a 'seizure' of 'persons' under the Fourth Amendment." Valance v. Wisel, 110 F.3d 1269, 1275 (7th Cir. 1997) (citing Wren v. U.S., 517 U.S. 806, 809-10 (1996).

Thus, there is no question that each plaintiff was seized within the meaning of the Fourth Amendment. The only question is whether that seizure was conducted in a reasonable manner. Obviously, plaintiffs do not contest that the initial stop was reasonable, given that each plaintiff has admitted the underlying traffic violation. Instead, plaintiffs argue that the manner in which Allegretti conducted the seizure was objectively unreasonable and crossed the constitutional threshold. See Herzog v. Village of Winnetka, 309 F.3d 1041, 1043 (7th Cir. 2002).

5

Fourth Amendment reasonableness "depends not only on when a seizure is made, but also how it is carried out. Tennessee v. Garner, 471 U.S. at 8. Allegretti's use of his authority as a police officer and the threat of prosecution to coerce (or attempt to coerce) plaintiffs to expose themselves and engage in sexual acts unwillingly, if true, was objectively unreasonable and would violate the Fourth Amendment.

Next, the City argues that plaintiffs cannot establish that Allegretti's actions were the result of a wide-spread practice that policy-makers were aware of and acquiesced in, resulting in a pattern of constitutional violations. To support their claim, plaintiffs refer to the Chicago Police Department's disciplinary investigations of similar misconduct. They retained an expert who has reviewed four years of Complaint Register Investigation files ("C.R.") for allegations of sexual misconduct, and rendered various opinions regarding the City's failures with respect to the investigation of such reports. This method of establishing a pattern or practice has been approved a number of times by courts in this circuit. See e.g. Garcia v. City of Chicago, 2003 WL 22175618 (N.D. Ill. 2003); Sorenberger, 434 F.3d at 1030.[1]

The City also argues that plaintiffs have no evidence that the City Council, which is the final policy-maker for the City, Auriema v. Rice, 957 F.2d 397, 399 (7th Cir. 1992), was aware of any problem and acted deliberately indifferent to a substantial risk that a violation would follow its decisions. To support this argument, the City relies on the recent decision in Moore v. City of

---

[1]In its reply brief the City raises the argument that plaintiffs' expert's conclusions are inadmissable based on flawed methodology. Plaintiffs' expert, Lou Reiter, has been accepted as a police practices expert numerous times, and the City has failed to attack his testimony under either Fed. R. Evid. 702 or Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The City's argument that Reiter's conclusions are unreliable because he relied on a de minimus sample goes to the weight of his testimony, not its admissibility.

Chicago, 2007 WL 3037121 (N.D. Ill. 2007), in which the court granted summary judgment to the City, because the plaintiff's evidence of the City's failure to exercise reasonable care in investigating and disciplining its officers for excessive force or false arrest was insufficient to overcome the high deliberate indifference standard. In reaching this conclusion, the court focused on evidence in the record showing that in 1997 and 1998 the City Council held hearings regarding allegations of police misconduct, and in 2000 passed a resolution calling for input regarding the disciplinary process during contract negotiations with the Fraternal Order of Police. Those negotiations resulted in a contractual provision allowing retention of "not-sustained" files for a period of seven years instead of the previously allowed five, and the use of such files to determine credibility in future investigations. The Moore court determined that the evidence demonstrated that the City was not deliberately indifferent because deliberate indifference requires a municipality to have made a "deliberate choice to follow a course of action," which is "akin to further adherence to an approach they know or should know has failed to prevent tortious conduct in the past," and that "failing to eliminate the practice cannot be equated with approving it." Id. at *11 (citing City of Canton v. Harris, 489 U.S. 378, 389 (1989); Bryan County, 520 U.S. at 407; Wilson v. City of Chicago, 6 F.3d 1233, 1240 (7th Cir. 1993)).

     In the instant case, plaintiffs argue that the City Council hearings and the resulting new collective bargaining agreement basically paid lip service to a problem recognized by the Council, which the Council knew would not be resolved by those new contractual provisions. According to plaintiffs, since that time the City has done nothing to prevent further violations despite being placed on notice of the continued problem. With all due respect to the Moore

7

court, this court agrees with plaintiffs that the City's evidence is insufficient to warrant summary judgment.

Whether the City's actions in 1997 and 1998 requiring simply a contract change without taking any legislative action shows a lack of deliberate indifference should be left for the trier of fact. The evidence in the instant case shows that in January 2000 Alderman Beavers submitted an official resolution recognizing that "Chicago police officers who do not carry out their responsibility in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct." A committee hearing was held, but nothing was done. In 2003, a jury returned a $1 million verdict against the City, finding a plaintiff's injuries were directly caused by the City's custom and practice of not adequately investigating, disciplining or prosecuting off duty police officers who used excessive force. Garcia v. City of Chicago, 2003 WL 22175618 (N.D. Ill. 2003). Although that $1 million damage award was later reduced by remittitur, the City Council was certainly made aware that its so-called efforts to correct the problems of inadequate investigation and discipline was failing. Yet, nothing more was done at that time.

Finally, in 2005 a proposal to amend the Municipal Code was introduced that would have addressed many of the issues raised by Alderman Beavers. The proposal called for sweeping changes in the investigation process. That proposal failed to pass the City Council, and the Chicago Police Department's disciplinary system remains unchanged to date. Based on the evidence plaintiffs have presented, they are entitled to argue to a jury that the City Council has been deliberately indifferent to the problem of police sexual misconduct, resulting in plaintiffs' injuries. Accordingly, the City's motion for summary judgment on Count I is denied.

In Counts III and IV, plaintiffs seek to hold the City responsible for Allegretti's actions based on the state law theories of respondeat superior and indemnification. Under either theory, plaintiffs will have to establish that Allegretti was acting within the scope of his employment when taking the challenged actions. In Illinois, "under a theory of respondeat superior, an employer can be liable for the tort of an employee, but only for those torts that are committed within the scope of employment." Bagent v. Blessing Care Corp., 224 Ill.2d 154, 163 (2007). To be within the scope of employment, an employee's acts must be: (a) the kind for which the employee is empowered to perform; (b) substantially within the authorized time and space limits; and (c) actuated, at least in part, by a purpose to serve the master. Id. Summary judgment "is generally inappropriate when scope of employment is at issue. Only if no reasonable person could conclude from the evidence that an employee was acting within the course of employment should a court hold as a matter of law that the employee was not so acting." Id.

In the instant case, there is no question that Allegretti's actions in stopping plaintiffs and issuing traffic citations are the kind of actions for which he was employed, and that all of his actions were taken within authorized time and space limits. The only question is whether his actions were in any way actuated by a purpose to serve the City. As the City has noted, Illinois is replete with cases holding that acts of sexual assault and molestation are outside the scope of authority. See Deloney v. Board of Education of Thornton Township, 281 Ill. App.3d 775, 783-84 (1st 1996) (and cases cited therein). Most of those cases are fairly old, however, and only one involved a police officer. In that case, which came from this court but interpreted Illinois law, the officer's actions were taken while "off-duty." Gambling v. Cornish, 426 F. Supp. 1153 (N.D. Ill. 1977).

9

More recently, the Seventh Circuit, in addressing police actions, has suggested that the scope of employment should be interpreted more broadly when the employee is a police officer. Doe v. City of Chicago, 360 F.3d 667, 671 (7th Cir. 2004). Although recognizing that the Illinois Supreme Court had yet to address the issue, Judge Posner indicated that the position "has a footing in other jurisdictions and may well be the wave of the future." Id. Indeed, Judge Posner suggested that perhaps a police department should be held strictly liable for torts of police officers who use their official powers to commit the torts. "[T]he power of a rogue police officer to do harm is so great that more than ordinary care on the part of his employer may be required in order to provide adequate protection to the public." Id.

Because no Illinois court had yet addressed the issue (and still has not), the parties in Doe asked the Seventh Circuit to certify the issue to the Illinois Supreme Court. The Seventh Circuit refused, in large part because, as in the instant case, the City had accepted the plaintiff's allegations as true for purposes of the plaintiff's motion for summary judgment. The police officer in Doe, denied those allegations, as does Allegretti. Thus, the Seventh Circuit indicated that at trial the jury could have rejected Doe's case entirely, which would have rendered moot any claim of vicarious liability against the City. Alternatively, the trial could have cast the facts in a different light from the version that the court was required to accept on appeal. Therefore, the court noted that "whether the scope of a police officer's employment should be deemed broader than that of other employees is a difficult and important question that we should not ask the state supreme court to answer on make believe facts."

The instant case is in the same procedural posture as Doe. It is possible that a jury may disbelieve plaintiffs and find for Allegretti, or it is possible that the facts may not be as alleged

by plaintiffs and accepted by the City for the purposes of the instant motion only. In Doe, Judge Posner reiterated that court's oft repeated warning against trying to resolve indemnity before liability. Id. at 672 (citing Lear Corp. v. Johnson Electric Holdings Ltd., 353 F.3d 580, 583 (7th Cir. 2003); Nationwide Insurance v. Zava lis, 52 F.3d 689, 693 (7th Cir. 1995); Grinnel Mutual Reinsurance Co. v. Reinke, 43 F.3d 1152, 1154 (7th Cir. 1995); Traveler's Insurance Cos. v. Penda Corp., 974 F.2d 823, 833-34 (7th Cir. 1992)). This court must heed that warning. Accordingly, the court denies the City's motion for summary judgment on Counts III and IV because it is premature.

## CONCLUSION

For the reasons set forth above, the City's motion for summary judgment is denied. This matter is set for a report on status January 31, 2008, at 9:00 a.m.

**ENTER:** **January 22, 2008**

_____
**Robert W. Gettleman**
**United States District Judge**